UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDRE MOTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22-cv-00399-TWP-MKK |
| | ) |
| CHRISTINE LIEDTKE, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Christine Liedtke ("Dr. Liedtke") pursuant to Federal Rule of Civil Procedure 56 (Dkt. 25). Plaintiff Andre Moton ("Mr. Moton") initiated this civil rights action alleging that psychologist Dr. Liedtke, was deliberately indifferent to his serious mental health needs while he was enrolled in the Intensive Residential Treatment ("IRT") Program at Pendleton Correctional Facility ("Pendleton"). Because there are disputes of material fact as to whether she was deliberately indifferent to Mr. Moton's mental health needs when group programming was unavailable, the Dr. Liedtke's Motion is **granted in part and denied in part**.

### I.     STANDARD OF REVIEW

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II. FACTUAL BACKGROUND

Because Dr. Liedtke has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. Background of the "IPAS" Agreement

Mr. Moton argues that Dr. Liedtke was deliberately indifferent to his mental health needs

because she did not ensure that he was receiving the mental health treatment contemplated by the settlement agreement reached in *Indiana Protection and Advocacy Services Commission, et al., v. Commissioner, Indiana Department of Correction*, Case No. 1:08-cv-01317-TWP-MJD. The Court hereinafter refers to the case as "*IPAS*" and the settlement agreement as the "IPAS Agreement". Because Mr. Moton focuses his attention on whether his mental health treatment comported with the IPAS Agreement, the Court discusses the relevant provisions of the *IPAS* case and ensuing agreement.

In 2008, the Indiana Protection and Advocacy Services Commission sued the Indiana Department of Correction ("IDOC") alleging that the continued confinement of mentally ill prisoners in segregation and segregation-like settings without appropriate mental health care and treatment violated prisoners' constitutional rights. *IPAS*, 1:08-cv-1317 (S.D. Ind.). Following a bench trial, the Court concluded that the "Plaintiffs have prevailed as to their Eighth Amendment Claim." *IPAS*, Dkt. 279 at 36.

The Court did not enter final judgment. Rather, in 2016, the parties in *IPAS* entered into the IPAS Agreement, which the Court found to be fair, reasonable, and adequate. *IPAS,* Dkt. 496, 508. Relevant to this case, the IPAS Agreement lists different medical conditions that qualify an inmate as "seriously mentally ill," including schizoaffective disorder. *Id.* at 4-5, ¶ 18. Under the IPAS Agreement, seriously mentally ill inmates who are housed in intensive treatment units such as Pendleton's IRT program are supposed to receive an individualized treatment plan created by a treatment team and at least 10 hours of therapeutic programming per week (*e.g.*, group and individual therapy). *Id.* at 15, ¶ 42. Finally, the IPAS Agreement places restrictions on the length and manner in which a seriously mentally ill prisoner can be placed in segregation/restrictive housing. *Id.* at 10-13, ¶¶ 30-35.

B. **Background of the IRT Program and the Parties**

Mr. Moton was at all relevant times an IDOC inmate housed in the IRT facility at Pendleton. Mr. Moton has been diagnosed with depression, schizoaffective disorder, and schizophrenia. (Dkt. 27-3 at 5 (15:3); Dkt. 27-2 at 18, 41.)

Dr. Liedtke is a psychologist licensed to practice in Indiana. (Dkt. 27-1 at ¶ 1.) During all times relevant to Mr. Moton's Complaint, she was a psychologist at Pendleton employed by Wexford of Indiana, LLC ("Wexford"), treating inmates in the IRT Program. *Id.* at ¶ 2. Part of Dr. Liedtke's job responsibilities "is to make sure that the staff in IRT are meeting both IPAS and the health care service directives of [IDOC]." (Dkt. 33-2 at 1 (15:22−24).)[1]

Inmates placed in the IRT Program are provided individual therapy, group treatment, and medication management of psychotropic medication. *Id.* at 4 (24:2−5). Individual therapy is provided once monthly, but if it is clinically indicated it will be provided more often. *Id.* 4 (24:19−20).

Group treatment is supposed to be offered ten hours a week. *Id.* at 4 (24:25). However, group treatment was often not able to be offered due to COVID-19-related lockdowns, correctional and mental health staffing shortages, and space issues due to a fire that burned down the treatment center. *Id.* at 5 (25:6−9); Dkt. 27-2 at 2. Mr. Moton explained that when group treatment was not offered due to staff shortages or other logistical reasons, it was called an "exception." (Dkt. 27-3 at 7 (25:13−17).) Dr. Liedtke acknowledged that understaffing resulted in the IRT program being "unable to consistently provide the appropriate amount of treatment for high-need offenders," who she identified as "any patient that's participated in IRT." (Dkt. 33-2 at 10−11 (32:19−25−33:1−4).)

---

[1] Mr. Moton included as an exhibit excerpts from a deposition of Dr. Liedtke taken in another case. (Dkt. 33-2.) With respect to this deposition and Mr. Moton's deposition at Dkt. 27-3, the Court first cites to the PDF and then to the page and line of the deposition. For Mr. Moton's medical records, the Court cites to the page of the PDF rather than the Bates-stamped number.

She testified that additional staffing on both the mental health and custody side would be necessary to provide "the services that we're here to provide." *Id.* at 11 (33:9−11).

### C. Mr. Moton's Mental Health Treatment at IRT, November 2020 through January 2021

#### 1. Group Treatment

Because much of Mr. Moton's Complaint focuses on his lack of access to group treatment, the Court describes how many hours of group treatment Mr. Moton was offered, how many he participated in, how many were "exceptions," and how many hours were refused, in the following table:[2]

| Week of: | # Hours Offered | # Hours Participated | # Hours Exception | # Hours Refused | Page citation (Dkt. 27-2) |
|---|---|---|---|---|---|
| November 2 | 1.5 | 1.5 | 5 | 0 | 2 |
| November 9 | 2 | 1 | 3 | 1 | 5 |
| November 16 | 4 | 0 | 3 | 4 | 8 |
| November 23 | 3 | 1 | 3 | 2 | 11 |
| November 30 | 1 | 1 | 4 | 0 | 24 |

Mr. Moton testified that when he skipped group it was because "[the exceptions] were going on for so long that I just felt like if you give me group one time out of three or four weeks, it's not really doing anything for me. And the damage was already done on top of there was a lot of discrepancies with my medications." (Dkt. 27-3 at 5 (15:11−16).)

Dr. Liedtke did not provide group treatment records for the rest of December 2020 or January 2021. *See* Dkt. 27-2. On December 26, 2020, Mr. Moton submitted a healthcare request form in which he asked why he had not been provided group treatment for over two weeks. (Dkt.

---

[2] These numbers never add up to ten, because, due to the previously discussed logistical issues, generally IRT staff could provide about six hours per week per inmate. (Dkt. 33-2 at 5 (25:1−11).)

33-4.) Dr. Liedtke signed the form on December 31, 2020, and wrote, "Our records indicate you have been offered group." *Id*. Mr. Moton submitted another healthcare request form on December 26, 2020 asking about why he had only one group treatment offered between December 4 and December 26, 2020, and on January 6, 2021, Dr. Liedtke responded, "You are offered groups as staffing allows." (Dkt. 33-5 at 1.)

Mr. Moton submitted several other healthcare request forms between December 23 and December 27, 2020, in which he stated he had not been offered group treatment, that the voices in his head were getting worse, that he was harming himself, that he believed he was decompensating, and that he was wrongfully being held in segregation longer than the law permits for mentally ill inmates. (Dkts. 33-9, 33-10, 33-11, 33-12, 33-13.) For example, one healthcare request form dated December 23, 2020, said the following: "Can somebody please help me? I'm hearing voices. My meds aren't working. I'm not getting any mental health treatment. I haven't had group in 2 weeks. Can somebody please do something about these voices? This is my second request begging for help. I've harmed myself twice & still no help." (Dkt. 33-9 at 2 (cleaned up).) Dr. Liedtke responded on January 6, 2021, that these requests had been addressed in the two previous healthcare request forms. *Id.*

Mr. Moton submitted a healthcare request form on January 7, 2021, in which he stated that he was not offered any group services between December 4 and December 28, 2020. (Dkt. 33-3.) Dr. Liedtke signed the form on January 13, 2021, and wrote, "This is untrue." *Id*.

    2.    **Other Mental Health Interventions**

Mr. Moton refused one individual therapy session on November 24, 2020. (Dkt. 27-2 at 13.) Mr. Moton was seen for an individual therapy session on December 8, 2020, at which time he reported that he was on a hunger strike because he was upset because he had not received a

shower for five days and had run out of his medication. *Id.* at 20−21. He later testified that he went on hunger strike with other inmates in the segregation unit because they were not receiving any group therapy, treatment, or recreation, but rather had simply been left in their cells. (Dkt. 27-3 at 6 (19:22−25).)

On December 14, 2020, Mr. Moton reported feeling suicidal ideations because he felt his hunger strike was not being taken seriously. (Dkt. 27-2 at 26.) Nurse Jody Murphy contacted Dr. Liedtke, who ordered that Mr. Moton be placed on constant suicide watch. *Id.*

Dr. Liedtke saw Mr. Moton on December 15, 2020, for a suicide watch visit. (Dkt. 27-1 at ¶ 13.) Mr. Moton told her that he was not experiencing suicidal or homicidal ideations, nor engaging in self-injurious behaviors. *Id.*; Dkt. 27-2 at 29. Mr. Moton said he would come off suicide watch only if she would help him obtain his medical records. (Dkt. 27-2 at 29.) Dr. Liedtke told him she would ask the HSA to see what could be done, and Mr. Moton agreed to return to his cell. *Id.*

Mr. Moton went back on suicide watch on December 16, 2020, after he hit his head against the window on his cell door, breaking the window. *Id.* at 32. Mr. Moton said his medications were not working, he was hearing voices, and the "program was not treating him fai[r]ly." *Id.* at 32, 33. Mental health care provider Herbert Troyer wrote, "Anxiety is significant and unclear. Depression is significant and unclear. Psychotic symptoms are significant and unclear." *Id.* at 33. Mr. Moton remained on suicide watch until December 21, 2020, when he stated he wanted to be removed from watch and was not going to harm himself. *Id.* at 35-36.

Dr. Liedtke next saw Mr. Moton on January 12, 2021, for an urgent consultation. (Dkt. 27-1 at ¶ 16.) Mr. Moton was very hostile and agitated because his medications had not been adjusted, and he threatened to sue Dr. Liedtke. (Dkt. 27-2 at 39.) Dr. Liedtke reminded him that,

as a psychologist, she played no role in prescribing medication. *Id*. She arranged for psychiatrist Dr. William Jones to meet with him that day. *Id*.

During Mr. Moton's consultation with Dr. Jones, Mr. Moton reported auditory hallucinations of a command nature. *Id.* at 41. Dr. Jones discontinued one psychotropic medication and prescribed Geodon, an antipsychotic medication used to treat schizophrenia, and encouraged him to continue with individual therapy. *Id.* at 42.

On January 21, 2021, Dr. Liedtke received a call that Mr. Moton was threatening to hurt himself with a razor. *Id.* at 45. She ordered that Mr. Moton be placed on close suicide watch with a suicide companion. *Id*. Four days later, Mr. Moton reported to a mental health professional Michelle Steel that he was not suicidal but had reported he was because he wanted medical assistance for his leg issues. *Id.* at 48.

On January 29, 2021, Dr. Liedtke again ordered that Mr. Moton be placed on suicide watch after he was observed holding a razor and telling officers that he was going to cut himself because he had been locked in his cell for three days . *Id.* at 51.

3. **Mr. Moton's Claims**

Mr. Moton filed this lawsuit because he was dissatisfied with the quality and quantity of mental health services offered at the IRT Program between November 2020 and January 2021. He describes his claims against Dr. Liedtke as follows:

> She didn't give me adequate group when, as far as I know, there's not supposed to be a segregation unit in the mental health unit, but I was placed in segregation for—they're not supposed to hold you longer than 30 days.
>
> I was placed in segregation for several months. Sometimes I went weeks without group or any mental health treatment. I'd go there asking for—I remember telling her that my mental health was deteriorating. I call it self-harm 'cause I was cutting on myself with razors. They still didn't do anything about it. They just basically ignored it.

8

(Dkt. 27-3 at 4 (13:18−24).)

Dr. Liedtke attested that she had no authority to place Mr. Moton in segregation for disciplinary or conduct-related reasons. (Dkt. 27-1 at ¶ 24.) The only control she had over his housing assignment was her ability to order that he be placed on suicide watch. *Id*. Mr. Moton acknowledged that his placement in segregation may have been an IDOC decision, but that inmates in segregation were still supposed to receive treatment and did not. (Dkt. 27-3 at 5 (14:12−19) ("[W]henever you're placed in segregation, you [sic] still supposed to get treatment, but they used the shortage of staff to their advantage. Sometimes the behavior health session [staff] just stayed in the bubble with the COs and just refused to give us group because we was [sic] in segregation.").)

Dr. Liedtke noted that Mr. Moton had a history of using suicide watch for secondary gain, non-compliance with medication, and refusing to engage in treatment. (Dkt. 27-1 at ¶ 23.) She believed that the mental health care Mr. Moton received was appropriate, reasonable, and within the community standard of care. *Id.* at ¶ 26.

### III.   DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5

9

F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this Motion, the Court assumes that Mr. Moton's mental illness is a serious medical need and that he qualifies as a seriously mentally ill inmate within the meaning of the IPAS Agreement. To survive summary judgment then, he must show that Dr. Liedtke acted with deliberate indifference—that is, she consciously disregarded a serious risk to his mental health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Mr. Moton "must provide evidence that [his medical provider] actually knew of and disregarded a substantial risk of harm." *Id*. "[A] jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). Additionally, "an inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett v. Webster,* 658 F.3d 742, 750−51 (7th Cir. 2011). Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.* A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. "The linchpin is a lack of professional judgment." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019).

As a preliminary matter, the fact that Dr. Liedtke failed to ensure that the requirements of the IPAS Agreement were met "does not equate to a constitutional violation" because "there is no evidence that the terms of the settlement . . . matched the constitutional floor." *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022). Rather, the question is whether Dr. Liedtke's actions in not

facilitating the treatment plan envisioned by the IPAS Agreement evinced "callous disregard" toward Mr. Moton's mental health needs.[3] *Id.* at 710. Dr. Liedtke had no authority to place Mr. Moton in, or remove him from, segregation, so she cannot be held liable for time he spent in segregation in violation of the IPAS Agreement. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation.") (internal quotation omitted).

    Mr. Moton's claim related to a lack of mental health programming during this timeframe, however, is different. As Dr. Liedtke explained, circumstances outside her control—staffing issues, COVID-19 quarantines, and a fire that destroyed one of the treatment units—prohibited Pendleton staff from being able to provide ten hours of group programming. (Dkt. 33-2 at 5 (25:6−9); Dkt. 27-2 at 2.) But there is a dispute of material fact as to whether Dr. Liedtke "undertook reasonable measures" to ensure Mr. Moton received adequate mental health care, especially during the month of December 2020. *Rasho*, 22 F. 4th at 711. Mr. Moton wrote multiple healthcare request forms in late December 2020 complaining about the lack of any mental health treatment, especially groups, and expressing concerns that his mental health was deteriorating as a result. While Dr. Liedtke likely could not resolve the staff shortage in order to provide more group sessions, there is no evidence she took *any* steps to provide Mr. Moton alternative mental health care (*e.g.*, additional individual therapy sessions, workbooks, etc.). Instead, her responses only addressed staff shortages and expressed some disagreement with respect to the number of group sessions offered during this time. *See* Dkts. 33-3 – 33-13. Dr. Liedtke argues that Mr. Moton's mental decline is "undoubtedly attributable to his own conduct"

---

[3] Dr. Liedtke argues in her reply brief that because the IPAS Agreement was between the Indiana Protection and Advocacy Services Commission and the IDOC, she was not obligated to ensure that the terms were met. (Dkt. 35 at 2.) But Dr. Liedtke testified that one of her main roles as the psychologist of the IRT Program was to ensure that the IPAS Agreement was upheld. (Dkt. 33-2 at 1 (15:22−24).)

because of his refusal to attend some group sessions, his lack of compliance with his medication, and his refusal to attend one counseling session. (Dkt. 26 at 9 (citing *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) for the proposition that a plaintiff cannot be permitted to "engineer an Eighth Amendment violation.").) The record is not so clear. Rather, his medical records reflect that he often participated in his mental health treatment, and his healthcare request forms indicate a lack of responsiveness by Dr. Liedtke when he was in the throes of a mental health crisis. Accordingly, summary judgment is **denied** with respect to whether Dr. Liedtke was deliberately indifferent to Mr. Moton's mental health needs when group treatment was unavailable.

Dr. Liedtke is entitled to summary judgment for her response to Mr. Moton's suicidal ideation. Suicidal ideation is a serious medical condition, *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). But no reasonable juror could conclude that Dr. Liedtke was deliberately indifferent to a risk that Mr. Moton would commit suicide. Rather, when Mr. Moton engaged in self-harm or expressed thoughts of suicide, Dr. Liedtke placed him on suicide watch for monitoring and removed him only when he assured her that he was no longer (or never had been) suicidal. (Dkt. 27-1 at ¶¶ 12, 14, 17, 20.) This was so despite the fact that Mr. Moton at times used suicide watch for secondary gain, such as to get access to his medical records. *Id.* at ¶¶ 18, 23.

To summarize, the undisputed evidence shows that Dr. Liedtke is not responsible for Mr. Moton's placement in segregation, and that she was not deliberately indifferent to his suicidal ideation. However, a jury could conclude that Dr. Liedtke was deliberately indifferent to Mr. Moton's mental health needs when she took no steps to offer Mr. Moton needed mental health care when he expressed his frustration at the lack of group offerings. Accordingly, Dr. Liedtke's Motion for Summary Judgment is **granted in part and denied in part**.

## IV. CONCLUSION

For the foregoing reasons, Dr. Liedtke's Motion for Summary Judgment, Dkt. [25], is **GRANTED in part and DENIED in part**. Mr. Moton's claim related to his lack of mental health care when group treatment could not be provided survives summary judgment, and this claim will be resolved via settlement or trial.

The Court *sua sponte* reconsiders its Order denying counsel, (Dkt. 11), and will attempt to recruit counsel on Mr. Moton's behalf to represent him through final judgment. The Magistrate Judge is requested to set this matter for a telephonic status conference once recruited counsel has appeared.

**SO ORDERED.**

Date: 8/28/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Andre Moton, #231926
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com

Sarah Jean Shores-Scisney
STOLL KEENON OGDEN PLLC
sarah.shores@skofirm.com

Magistrate Judge Kendra Klump